[Crim. No. 235.   Fourth Appellate District.—June 21, 1932.]

THE PEOPLE, Respondent, v. HOWARD J. ABBEY, Appellant.

Edward L. Davin for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—On or about January 30, 1932, James N. Crofton received a letter reading as follows:

"It is your time to make a donation to us. You can take the easy way if you are smart. The hard way may not be good for you. You do as we tell you and no one will get hurt. Otherwise you can blame yourself for what

happens. You have been on the list quite a while but don't know it. You've been lucky. Get $7,500.00 Dollars in 100 Dollar Bills, and have ready to deliver when we tell you to. When you are ready to pay put ad in the Evening Tribune, 3 days straight, reading.

"In Personal Column

"William that deal is OK with me. Signed Roy.

"A Mr. Houston will phone you where to deliver money. Give envelope containing money to your negro butler but tell him nothing. For this consideration your safety will be assured. We will move away. No frame goes. Try to frame us and May God help you. A bad move and you will pay with something besides money. Report this to the police or any of your friends your lights will go out. We warn you to make no false moves.

"HOUSTON."

Both the letter and its envelope were written with printed letters. About 9 o'clock on the evening of February 2, 1932, Crofton received a telephone call from a man who said he was Houston, asking if he received "my letter" and "what are you going to do about it?" Upon being told that he was not going to do anything the man replied, "Well, you better do something because if you don't we are going to fix you up." After a little discussion Crofton agreed to meet the man at 10 o'clock that night in the depot in San Diego, the man stating that he could be recognized by certain wearing apparel. Crofton went to the depot at 10 o'clock and by arrangement a number of his friends, including a deputy sheriff of San Diego County and the San Diego fire chief, were also in the room. Shortly after Crofton arrived, the appellant entered the waiting-room of the depot, dressed as the man had said over the telephone he would be dressed. The appellant asked Crofton, "Did you bring it with you?" Crofton testified that as they sat down to talk the appellant jabbed him with something which he had in his coat pocket and said, "I have a gun on me, and if you try to do anything I am going to let you 'have' it." He then testified: "And I told him—'Well,' I says, 'I have got a gun on me; and if you do anything I am going to let you have it, too.' So I had it in my coat, and I let him feel of it just like he let me feel of his gun." A conversation ensued during

which the appellant referred to the letter and to the telephone conversation above mentioned and asked Crofton what he was going to do about it, and when he replied that he was not going to do anything, the appellant answered "you better". During this conversation the appellant called Crofton's attention to the deputy sheriff who was in the room, saying he looked like a "bull" and that "if he makes a move and comes toward us I'm going to let you have it". After some discussion, during which Crofton said he was unable to pay $7,500, the appellant finally agreed to accept $2,000, which was to be paid two days later at the same place and the same hour. After the conversation, the appellant left the waiting-room and entered an automobile, but upon this car being followed by Crofton's friends, the appellant left the same and disappeared.

The fire chief and the deputy sheriff both testified that they were present at the depot on the occasion in question and saw the appellant talking to Crofton. The deputy sheriff had heard none of the conversation and the fire chief had only heard a portion thereof, in which Crofton asked the appellant if he was looking for him, in which Crofton told the appellant that he was unable to pay $7,500, and in which he heard some suggestion of the sum of $2,000. A few days later Crofton received a letter which had been mailed at Long Beach on February 6th, reading as follows:

"Feb. 1932.

"Crofton you have started something now. I am not there now, but will be there very soon. But my men are there and will be there until its done. I kept my word, you did not keep yours. I had a feeling you wouldn't. The only thing that saved you is no move was made. Now you will pay and it won't be no $2,000 either. It went up a few for putting us through all that trouble. Your going to pay some time so the quicker the better. If you want to do business Put ad in Los Angeles Examiner Reading John come home your mother is ill. Harry. And keep it there for five days. Then you will hear from me. You were just lucky that nothing went wrong. So think and think fast. You can get as many guards as you want, that don't mean a thing to me. I guess by now you know that.

"HOUSTON.

"Put that ad in Personal Column."

This letter was written in printed letters, but its envelope was addressed in longhand. A handwriting expert testified, comparing the handwriting of the envelope in which the second of these letters was mailed with exemplars of the proved handwriting of the appellant, giving his opinion that all of these were written by the same person, with his reasons therefor, and being thoroughly cross-examined in relation thereto. He also pointed out that both letters were printed by the same person. On February 13, 1932, the appellant was arrested at his apartment in Los Angeles, at which time and place the arresting officers found two .38-caliber Colt revolvers loaded with dumdum bullets, together with other cartridges, the revolvers being found under the appellant's hat. The appellant was charged in one count with attempted extortion and in another count with the possession of a forbidden firearm after conviction of a felony. The appellant admitted the prior conviction, stating that on September 25, 1931, he was released from San Quentin after serving ten years for robbery. He was found guilty on both counts, and has appealed from the judgment and from an order denying a motion for a new trial.

Two points are raised by the appellant, the first of which is that the court erred in admitting in evidence the two revolvers and cartridges found in his room. It is contended that the possession of these articles by the appellant has no tendency to prove any material fact in either count of the information and that such possession constituted a separate and distinct offense. The last part of this contention is immaterial if the articles in question were properly admissible as evidence in this case, which is the only question that need be here considered. While appellant concedes that under established rules these guns would have been admissible in evidence if Crofton had seen a gun in the hands of the appellant at the depot that night even though the identity of the gun was not positively established, he contends that since Crofton did not see a gun in his possession there is nothing in the record to furnish any means of identification, even a general one, and therefore it was error to admit the guns in evidence. It is well settled that in such a case a gun need not be positively identified as the one used. The amount or degree of the identification of a gun used in the commission of a crime necessary to justify

the admission of such an exhibit in evidence varies with the circumstances in particular cases. The mere fact that a gun is kept in a coat pocket should not, as a matter of law, preclude all other proof. There is evidence here that the appellant was armed with a gun on the occasion in question and some evidence of its size and shape. Crofton testified that the appellant told him he had a gun and threatened to use it; that he jabbed him with something he had in his coat pocket; that ''he let me feel of his gun''; that ''it looked like a gun in his pocket and he told me it was a gun''; that ''I could see through his coat. I did not see the gun, but I know the size of the object that was in his coat . . . it was about the size of that gun''; and that ''he told me it was a gun and it looked a little like it.'' He also testified that the guns offered in evidence were about the size of the object which the appellant had in his pocket. We think this identification was sufficient, under the circumstances of this case, to justify the admission of the guns in evidence (*People* v. *Peete,* 54 Cal. App. 333 [202 Pac. 51]; *People* v. *Gilman,* 43 Cal. App. 451 [185 Pac. 310]; *People* v. *Ferdinand,* 194 Cal. 555 [229 Pac. 341]; *People* v. *Stoerkel,* 87 Cal. App. 336 [262 Pac. 825]). The evidence in question was admissible for the purpose of showing that the appellant had the means available to commit the crimes in the manner described by the witnesses (*People* v. *Hale,* 81 Cal. App. 734 [254 Pac. 639]), and also for the purpose of corroborating the testimony of Crofton that the appellant was carrying a gun on the occasion in question and that this fact was at that time admitted by the appellant.

Even if it could be held that the admission of this evidence was error, it could not be held sufficiently prejudicial to require a reversal. In reference to the charge of attempted extortion, the possession of a gun by the appellant, although a proper element of the proof was not an essential one, but the fact remains that the same was completely proved and positively brought home to the appellant. In relation to the charge that the appellant was in possession of a gun at that time, this fact was so thoroughly proved that even the wrongful admission of this evidence could not have resulted in a miscarriage of justice. Not only is such possession at the time shown by the testimony of Crofton, and his testimony as to the admission of that fact

418

by the appellant, but we have a virtual admission of the same by the appellant in the letter subsequently addressed by him to Crofton in which, in speaking of what took place at the depot that night, he said: "The only thing that saved you is that no move was made" and "you were just lucky that nothing went wrong".

The second point urged is that the court erred in permitting the prosecution to cross-examine the appellant as to an alleged statement made by appellant to a deputy sheriff during a recess of the trial. The appellant took the stand and testified at length as to all of his actions on the afternoon and evening preceding and during his meeting with Crofton at the depot on the night in question. While he denied having attempted to get any money from Crofton, he admitted that he was in the depot that night. He testified that he had been told by two strangers to go there and get some liquor from some man; that when he asked this man if he had "brought it with him", he referred to this liquor; that he sat and talked to this man about ten minutes; and that, "Well, I sensed there was something wrong when this man, supposed to be Crofton, started to talk to me about '7,500' and '3,500' and '2,000'. I didn't know what he was talking to me about." On cross-examination he was asked whether he had not that day told a deputy sheriff that "you thought things looked pretty tough for you and you were going to blow on the whole gang". He at first denied he had talked with the deputy sheriff at all and then admitted that he had talked with him but denied that he had made such a statement. Thereafter, the deputy sheriff in question was called and testified that the appellant had not made such a statement but that "he remarked that in case of his conviction he would tell a story that would make everyone listen, and that he would tell it from the witness stand". The court had sustained several prior objections to questions by which it was sought to bring out this evidence. When the final question was asked, which was answered, the only objection made was that no proper foundation had been laid and that it was not proper impeachment. The objection was not then made that it was not proper cross-examination and after the question was answered, counsel for the appellant asked that the answer be stricken on the ground that it was not responsive.

The court denied the motion but instructed the jury that it was not evidence on any fact in the case. In view of the direct testimony of the appellant, a fair argument could be made that this was proper cross-examination, but conceding appellant's contention that it was not, it neither appears that proper objection was made at the time nor that any prejudicial error has resulted.

No prejudicial error appearing, the judgment and order appealed from are affirmed.

Jennings, J., and Scovel, J., *pro tem.*, concurred.